**Brian SAMUELS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 2–985A300.

Court of Appeals of Indiana, Second District.

March 23, 1987.

---

Donald J. Tribbett, Logansport, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

Brian Samuels appeals his conviction, following a jury trial, for robbery while armed with a deadly weapon, a class B felony.[1]

1. I.C. 35–42–5–1 (Burns Code Ed. Repl.1985).

We reverse and remand.

The facts most favorable to the verdict are that a Logansport service station was robbed on December 29, 1984. Samuels and Eric Fox entered the station and ordered the attendant into a storage area, which was then locked. Fox took the money from the cash register. Samuels was wearing a green army-style coat with the hood pulled snugly around his face, such that the attendant could not identify him. The robbery took very little time. Samuels was armed with a rusty, sawed-off, .22 caliber automatic weapon, which his girlfriend had obtained for him earlier that day. Over $1,000 was taken from the station.

Samuels fled to the nearby house of some acquaintances. There, Samuels, wearing the green jacket, was breathing heavily as if he had been running. Samuels had a large wad of cash, which he split with Fox. A latecomer to the house told the people gathered there that the station had been robbed. Samuels then left quickly. After some discussion among themselves, the group then went to the service station and told the attendant that they believed Samuels was involved in the robbery.

At trial, Eric Fox testified that he and Samuels committed the robbery. Fox acknowledged the existence of a plea agreement. He knew he had been charged with a class B felony and that he faced the possibility of a jail term. Fox testified that he received a dismissal of charges in return for his testimony in Samuels' trial, after first having been offered some sentencing arrangement, and later, treatment as a juvenile. Fox turned down the latter two offers, and testified only in return for a total dismissal. Defense counsel was able on cross-examination to elicit this information, as well as Fox's prior, inconsistent statement which exculpated Samuels. Defense counsel was not, however, allowed to question Fox concerning the potential penalties for a class B felony, the offered sentencing arrangement, or Fox's knowledge of those possible penalties.

Samuels argues that the trial court improperly limited cross-examination of Fox's motive and interest in testifying by preventing questions concerning the penalties Fox faced. We agree.

■ Certain basic principles apply to the testimony of an accomplice (or co-conspirator). An accomplice's testimony is highly suspect, *Newman v. State* (1975) 263 Ind. 569, 572, 334 N.E.2d 684, 687, and should be strongly scrutinized by the trier of fact. *Kelley v. State* (1984) Ind., 460 N.E.2d 137, 138. This degree of scrutiny arises from a recognition that, "[h]uman nature would tend to cause an accomplice to 'unload' against their partners and desire to clear themselves as much as possible of blame for a crime...." *Newman, supra*, 334 N.E.2d at 687. To analyze effectively the testifying accomplice's credibility, the fact finder must have before it, "a frank disclosure of any promises by the State or the prosecuting attorney to grant immunity to a witness and ... any rewards offered to a witness." *Adler v. State* (1967) 248 Ind. 193, 197, 225 N.E.2d 171, 173. *See Bewley v. State* (1966) 247 Ind. 652, 655, 220 N.E.2d 612, 614 (improper limit on cross-examination when questions of pending financial reward from employer disallowed). This disclosure must include all relevant circumstances which caused or induced the witness's testimony. *Newman, supra*.

The precise question involved here, however, is not merely the disclosure of the agreement's existence. Rather, the issue is whether the trial court must allow questions concerning the quantum of benefit the agreement produced for the testifying accomplice. Such questions concern to what extent the testifying accomplice avoided or reduced the potential criminal liability. Resolution of the issue involves competing considerations. The desirability of full disclosure of plea agreement factors may be tempered by a desire to reduce the encouragement to a jury to compromise its verdict in light of possible disproportionate penalties for the same offense. *See De-*

*bose v. State* (1979) 270 Ind. 675, 389 N.E.2d 272.

Our Supreme Court has addressed this particular question three times. In *Clifford v. State* (1984) Ind., 457 N.E.2d 536, the testifying accomplice denied the existence of a plea agreement but stated that plea negotiations had been suspended until Clifford's trial was over. The jury was aware that the accomplice was incarcerated and awaiting disposition of the charges. The trial court sustained the prosecution's objection to a question to a police officer, "Did you advise him that a sentence on a Class A felony is non-suspendable?" *Id.*, at 541. The Supreme Court affirmed, noting that the jury had "ample information with which to judge [the accomplice's] testimony." *Id.* Any further information concerning sentencing was irrelevant, the court concluded, particularly because the jury had no sentencing function.

In *Shoulders v. State* (1985) Ind., 480 N.E.2d 211, the testifying accomplice disclosed the terms of his plea agreement. The charges of class A robbery and class D theft were dismissed in return for a plea of guilty to class B burglary, with no sentencing recommendation. He also testified that he was informed of the maximum possible sentence for a B felony, and that he had received a six-year sentence. Our Supreme Court affirmed the trial court, which disallowed the question to the accomplice of whether he had been informed of the penalty for conviction of a class A felony. The court concluded, much as it had in *Clifford*, that the possibility of a compromise verdict would be raised by the additional information, and that knowledge of the sentence for a class A felony would not "have added tellingly to the impeaching value of the bargain." *Shoulders, supra,* 480 N.E.2d at 212.

Most recently, in *Jarrett v. State* (1986) Ind., 498 N.E.2d 967, the Supreme Court reached a much different conclusion. There, the trial court refused to allow questions concerning possible penalties testify-

ing accomplices faced if they had not consummated a plea agreement, which allowed them to avoid imprisonment. The court concluded:

> "While sentencing information may not be relevant to the jury's duty in a criminal case, we do not perceive it to present a substantial risk of prejudice to the State. To the contrary, however, significant harm results when the jury is prevented from learning the extent of benefit received by a witness in exchange for his testimony. It would be obviously relevant and proper for a jury to consider the amount of compensation a witness expects to receive for his testimony. It is equally proper for this jury to know the quantity of benefit to accusing witnesses. It is quite relevant whether they are thereby avoiding imprisonment of ten days, ten weeks, or ten years." *Id.* at 968.

The *Jarrett* court reversed the conviction and held that the goal of preventing disclosure of potential penalties was subordinate to the defendant's cross-examination rights.

It appears that, though the *Jarrett* court used the same methodology as *Shoulders* and *Clifford*, the latter two cases have been implicitly [2] overruled or at least modified by *Jarrett*. Those two cases may no longer be read to preclude any inquiry into the possible penalties the testifying accomplice may have faced. Balancing the competing goals of full cross-examination and preventing prejudicial information concerning sentencing from reaching the jury remains the proper mode of analysis. Nevertheless, *Jarrett* compels, at minimum, that the balance be struck such that questions to an accomplice concerning potential penalties must be allowed. Here, the trial court erred. The court did not allow testimony concerning Fox's knowledge of potential penalties. The court allowed only testimony of the plea agreement's existence and the eventual result—dismissal of the charges.[3]

---

**2.** The court in *Jarrett* did not cite either *Shoulders* or *Clifford*.

**3.** We therefore do not address the issue whether questioning in this area must cease when a testifying accomplice states that he or she did

We must therefore reverse and remand because of the importance of Fox's direct testimony of Samuels' involvement, his prior inconsistent statement, and the importance of accomplice testimony generally. We cannot say that the error was harmless. *See Newman, supra,* 334 N.E.2d at 688; *cf. McIntyre v. State* (1984) 2d Dist. Ind.App., 460 N.E.2d 162 (where cross-examination of victim was improperly limited, with respect to threatened contempt if victim did not testify, court could not speculate as to conclusion jury would have drawn.) [4]

Samuels claims two additional grounds for reversal, which we address because they will likely arise on retrial. Neither constitute error.

Samuels first attacks final instruction eight, which reads in part: "It is not necessary that facts be proved by direct evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other." [5] Samuels claims the last sentence invades the province of the jury, impermissibly instructing on evidentiary weight. The State argues that the instructions as a whole do not compel a particular weight to be attached to either form of evidence, pointing to the sixth instruction, a portion of which reads: "You should give the greatest weight to the evidence which convinces you most strongly of its truthfulness."

It is axiomatic that instructions which imply a particular perspective on matters of evidentiary weight and credibility invade the province of the jury, *Voss v. State* (1984) 3d Dist. Ind.App., 469 N.E.2d 788, 792, and that instructions must be read as a whole to determine if error occurred. *Hansford v. State* (1986) Ind., 490 N.E.2d 1083, 1093. When the two instructions are read together, it is clear that the questioned instruction did not, of itself, direct that a specific weight be attached to either the direct or circumstantial evidence in the case. The instruction may well be drafted more clearly to inform the jury that neither type evidence is *necessarily* entitled to more weight than the other. However, there was no error in giving the instruction, particularly when it was given with an instruction which bound the jury to link weight with persuasiveness as to truth. *See Dorsey v. State* (1986) Ind., 490 N.E.2d 260.

Samuels mounts a two-pronged attack with regard to the "deadly weapon" aspect of the case.[6] Samuels tendered two instructions, one of which defined a "firearm" as that which would fire a projectile by combustion. The other stated that a weapon which cannot fire is not a "deadly weapon." The court refused both instructions. Samuels assigns error in the failure to give the instructions, and also argues that evidence of a "deadly weapon" was insufficient.

not know what the potential penalties were. *See Jarrett, supra,* 498 N.E.2d at 971 (Pivarnik, J. dissenting and joined by Givan, C.J.).

4. It may well have been that Fox's credibility was as effectively impeached as possible when the jury was made aware that Fox had declined the first two overtures from the State, and had struck a bargain of total dismissal. A reasonable juror may well have concluded that the subjectively successful negotiation Fox entered demonstrated a shrewd and calculating approach to the charges and the obligation to testify. Nevertheless, we cannot say that Fox was effectively impeached. That determination rests solely with the jury.

5. The instruction is a pattern jury instruction. Indiana Pattern Jury Instruction (Criminal) 12.-01 (1980).

The Indiana Pattern Jury Instructions were prepared by a committee of the Indiana Judges Association in 1980. The foreward to the criminal instructions contains a caveat that the appellate courts are not bound by the instructions. In *Hobbs v. Tierney* (1986) 1st Dist. Ind.App., 495 N.E.2d 217, 220, the court stated that the pattern jury instructions were "tacitly approved" by the Supreme Court in T.R. 51(E), and that the tendered instruction was therefore a correct statement of the law. Trial Rule 51(E) provides that a party requesting a pattern instruction need only request it by number, and need not reproduce the instruction verbatim (except in an appellate brief, if the instruction is an issue).

6. I.C. 35–42–5–1 makes robbery a class C felony. If a deadly weapon is used or if bodily injury to a person other than the defendant results, the felony is promoted to class B.

Whether there is sufficient evidence of a deadly weapon is first determined by looking to whether the weapon had the actual ability to inflict serious bodily injury under the fact situation. It must then be determined whether the "[d]efendant had the apparent ability to injure the victim seriously through use of the object during the crime." *Miller v. State* (1986) Ind., 500 N.E.2d 193, 197. Questions of manner and circumstances of use, and weapon description, are jury questions when differing conclusions may be reached as to the weapon's deadly propensities. *Id.*

There was sufficient evidence from which the jury could conclude that the weapon involved was in fact deadly. Fox testified that the gun was a .22 automatic, that the gun barrel was approximately six inches long, and that the gun had a butt. Another witness testified that the gun was a shot gun and that it was a real, not a toy, gun. Even if the jury chose to believe that the gun could not fire because it was rusty, the evidence suggested that the barrel or butt could be used as a bludgeon. This is sufficient evidence to support a finding of a deadly weapon. *Barber v. State* (1981) 4th Dist. Ind.App., 418 N.E.2d 563, 568.

By the same token, Samuels' tendered instructions were properly refused because they did not inform the jury as to all manners by which it could find the existence of a deadly weapon.

The judgment is reversed and the cause remanded for a new trial.

SHIELDS, P.J., concurs.

BUCHANAN, J., dissents with opinion.

BUCHANAN, Judge, dissenting.

I must dissent. While the majority relies on *Jarrett v. State* (1986), Ind., 498 N.E.2d 967, which held that it is relevant for a jury to be informed of possible penalties that a testifying codefendant may have faced had he not entered into a plea agreement, the trial court's refusal to allow questions concerning possible penalties that Fox faced constituted harmless error in this case. Neither *Jarrett* nor the other decisions relied upon by the majority stand for the proposition that testimony *must* include the maximum sentence facing the witness upon conviction of a criminal charge.

Certainly, a factfinding body should have before it all the relevant circumstances that caused or induced a witness to testify, including the rewards for such testimony. *Newman v. State* (1975), 263 Ind. 569, 334 N.E.2d 684. It is proper for a jury to consider the amount of compensation a witness expects to receive for his testimony as well as the quantity of benefit to the accusing witness, *Jarrett, supra.* But the trial court's refusal to allow such questioning should not constitute reversible error in every circumstance.

In *Jarrett*, both testifying witnesses pled guilty to lesser offenses than those originally charged, and the jury only knew that those witnesses received probation in exchange for their testimony. As a result, the jury in *Jarrett, supra*, could not have known the extent of the benefits the witnesses received unless the trial court permitted the jury to be informed of the length of imprisonment avoided. Here, the jury had sufficient facts regarding the circumstances of Fox's testimony to evaluate his credibility, and it knew the relevant factors that caused or induced Fox to testify, including the rewards and benefits received in exchange for his testimony.

At trial, the jury knew that the police talked with Fox on three occasions asking him to testify against Samuels. *Record* at 346. The jury also knew that Fox only agreed to testify in exchange for a dismissal of the class B felony charge and that he would serve no time. *Record* at 347–48. The jury was also made aware that a class B felony "carried a substantial amount of time" and Fox would face potential perjury charges if he testified that Samuels did not commit the crime because of prior statements he made to police. *Record* at 349. Although knowledge of the sentence for the class B offense may have been relevant, the jury was well aware of Fox's potential benefit of the plea agreement without any references to the length of any avoided penalties. *Shoulders v. State*

(1985), Ind., 480 N.E.2d 211; *Clifford v. State* (1984), Ind., 457 N.E.2d 536. While a maximum potential sentence is a factor to be considered by the jury where a witness enters into a plea agreement, the absence of such knowledge in this case was harmless error in light of all the information the jury did have.