**Marjorie JANNER, a/k/a Midge Janner, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 34A04–8704–CR–132.

Court of Appeals of Indiana, Fourth District.

April 18, 1988.

———

Richard L. Swartz, P.C., Wabash, for appellant.

Linley E. Pearson, Atty. Gen., Jay Rodia, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

MILLER, Presiding Judge.

Marjorie Janner was convicted of Conspiracy to Deal Cocaine, a class B felony,[1] and Maintaining a Common Nuisance, a

---

1. Ind. Code 35–41–5–2 and 35–48–4–1.

Class D felony.[2] The trial judge sentenced her to ten- and two-year concurrent terms for the respective offenses. But, because this was her first offense, and because of other mitigating factors,[3] the judge suspended both sentences and placed her on supervised probation for five years, unsupervised probation for five years, and fined her $1200.

Janner appeals her conviction claiming, among other things, the trial court erred by excluding evidence which would have established the bias and prejudice of the State's main witness, a paid state informer. Because we reverse, we address only this one of Janner's alleged errors.

### FACTS

On February 8, 1984, sixty-six year old Marjorie Janner drove her adult grandson, Bill Janner, and his friend, Chris Dawson, from her home in Kokomo to Billy Bob's Trailer Court just outside of the city. Bill and Dawson, having no transportation, gave Janner five dollars for gas to give them a ride. Unbeknownst to Janner or to Bill, Dawson was a paid informant for the Kokomo Police, and was fitted with an audio transmitter to record a potential drug deal involving Bill.

As they rode along, Dawson instigated—and secretly taped—a general conversation about drugs. Janner was drawn into and participated in this conversation. When they arrived at the trailer court, Bill left the car; Janner and Dawson remained in the car. Later, Bill returned with an envelope containing a sample of the cocaine to be purchased. Dawson tasted the drug. Upon determining that it was indeed cocaine, he passed the money to pay for it to Bill through the opening between the bucket seats. Bill again left the car, returned, and the three rode back to Kokomo, whereupon Dawson got out on a street corner, allegedly to meet his drug customer. Janner and Bill rode home alone.

The tape recording of the conversation between Janner, Bill and Dawson was introduced at trial and included in the record on appeal. The tape, although not completely audible—particularly as to Janner's voice—revealed the following. After they reached their destination, and before Bill left the car, Dawson told him he didn't want any "monkey stuff." At that point, alone with Dawson, Janner asked him if he had been buying and selling drugs. Dawson answered that he was down on his luck and had to do whatever was required to make a little money. He said that if he could sell some cocaine quickly, he could double his money.

The car door opened, and Dawson told Bill to hand "it" (the cocaine) back to him, and to be careful not to spill it. After Dawson checked the cocaine, he talked to Janner in a general way about selling drugs. Janner encouraged Dawson to seek honest employment, whereupon Dawson discussed his plan to earn enough money to travel to Texas where he thought he could obtain work on an oil rig. Janner again encouraged Dawson, but cautioned him to be sure the job in Texas was available before he used his money to go there. Janner then talked about the amount of money she thought would be required for Bill and Dawson to go to Texas together.

Following this exchange, the door again opened and the car engine started. Dawson asked Bill if "he" (the supplier) would have "more" (cocaine) in the next few days. Later, Janner inquired as to whether Dawson was snorting cocaine. Dawson replied he was not. Then, Dawson and Bill engaged in banter about the police, Dawson stating that he had once stolen a police car.

At one time during the return trip to Kokomo there was some talk about the car being stopped by police. Dawson joked that Janner's picture might be on the front page of her own newspaper. (Janner published a local newspaper). Janner stated

**2.** Ind. Code 35–48–4–13(b).

**3.** At the sentencing the trial judge stated:
"... the Court further now finds that there are a number of mitigating factors, to-wit: 1) She is a well known person in the community; 2) The Defendant's age and service to the community; 3) Defendant had no plan or conspiracy to deal in cocaine for monetary gain, ..." (Record at 153).

something to the effect that she had driven the young men out there, and further that she might be crucified. The tape of Janner's voice was, in many instances, inaudible, and the recorded conversation was not always understandable.

At trial, Janner stated that she had thought the reason Bill wanted to go to the trailer court was to admonish his sister's boyfriend, who lived there, for physically abusing Bill's sister (and her granddaughter) who was pregnant.

Over objection, the trial court allowed Dawson, the State's key witness, to give his opinion whether Janner knew an illegal transaction was taking place in her presence. The State asked, "[i]n your opinion, did Mrs. Janner have some idea that some illegal activity was going on at the Billy Bob Trailer Court?" Dawson answered, "[u]h, I believe that she knew that we, we were up to something illegal. At that point, I don't believe she knew what we were doing." (Record at 246).

Janner attempted to impeach Dawson by cross-examining him about a charge against him for burglarizing her home sometime between the time of the incident at issue and the trial. The State had dismissed the charge after he pled guilty via a plea bargain. The trial court sustained the State's objection on the basis that impeachment should be limited to acts of misconduct resulting in convictions. Then, during Janner's testimony on direct examination, she made an offer to prove in order to introduce this same evidence to show Dawson's prejudice against her, and his bias in favor of the State. She also offered the testimony of a Kokomo policeman on this same matter and for the same reasons, but the trial court would not allow either Janner's testimony or that of the policeman.

## DISCUSSION AND DECISION

The sole issue in this case is whether the trial court violated Janner's Sixth Amendment right to confront witnesses when the court refused to permit her to introduce evidence—either by cross-examination or by direct testimony—of the State's main witness's bias and prejudice. We find it did.

Both the United States and Indiana constitutions guarantee the right of an accused in a criminal prosecution to confront the witnesses against him.[4] The primary purpose of confrontation is to provide the opponent with an opportunity to cross-examine a witness, that is, to personally direct questions to and obtain immediate answers from the witness. 5 J. WIGMORE, EVIDENCE, § 1395, at 123 (3d ed. 1940).

Cross-examination is the main method for testing the believability of a witness and the truth of his testimony. A trial judge has broad discretion to set the boundaries for cross-examination in order to protect a witness from repetitive and harassing questions. But, within those boundaries, the cross-examiner may impeach or discredit, the witness. *Davis v. Alaska* (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.

One way of discrediting a witness is to show that he was convicted of certain crimes which impugn the credibility or trustworthiness of the witness. A witness's credibility may be impeached by proof that he was convicted of crimes that relate to dishonesty or false statement, or infamous crimes.[5] Other ways of attacking a witness's credibility are to prove facts of general bad character and character for dishonesty, mental and physical defects, drug and alcohol use, prior inconsistent statements and acts and bias, interest, and motive. J.A. Tanford & R.M. Quinlan, *Indiana Evidence Manual* 187–194 (1987).

All of these ways of impeaching a witness are permitted to aid the fact finder in judging the witness's credibility. The failure to disclose relevant evidence which has a direct bearing on a witness's credibility presents a danger that the fact finder will be misled by remaining uninformed about

4. U.S. CONST.AMEND. VI; Ind. Const. Art. I, § 13.

5. Infamous crimes were described in *Ashton v. Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210, as treason, murder, rape, arson, burglary, robbery, kidnapping, forgery, and perjury.

the witness's believability, and thus hampered in judging the witness's credibility. Exclusion of such evidence undermines the truth finding function of our judicial system. *Fullenkamp v. Newcomer* (1987), Ind.App., 508 N.E.2d 37.

Here, Janner sought to either cross-examine the State's chief witness, Dawson, or give evidence through her own direct testimony and that of a Kokomo policeman that Dawson was biased in favor of the State and prejudiced against her. Her evidence of Dawson's bias toward the State was that he had burglarized her home after the instant incident occurred and before trial, that he was charged with the burglary and pled guilty to it, and that the State had later dismissed the case. She sought to reveal his self interest in testifying by uncovering the circumstances under which the State had dismissed the charge. Further, she stated that her refusal to give Dawson a ride on one occasion had angered him and led to his burglarizing her home [6] as a way of retaliating against her. But, when the State objected to her testimony, it was excluded by the court.

The following colloquy between the attorneys and the trial court during Janner's cross-examination of Dawson reveals the questions that were raised and the trial court's reason for sustaining the State's objection.

Mr. Swartz [counsel for Janner]:

Q. "Is it not a fact that the Howard County Prosecutor charged you with burglary of Midge Janner's home and also with theft?

A. Yes, that's correct.

Q. And is it not also a fact that you went to court in Superior Court here and you pled guilty to that charge as part of a plea bargain?

A. No, that's not correct.

Q. Mr. Dawson, you're telling us that you did not appear in that court on May 24, 1985? And file a written recommendation of plea bargain as to count two, in which you plead guilty? You did not do that, with your attorney?

A. No, I didn't. The charges were dismissed." (Record at 261–262).

At this point the State asked the trial court to have the jury withdraw in order that the prosecutor could approach the bench outside the presence of the jury, and the jury withdrew. These excerpts reveal the exchange that followed between the attorneys and the judge:

Mr. Hainlen [Prosecutor]:

"Judge, Mr. Swartz has handed me documents he's preparing to introduce. Clearly, the last entry is in regard to Dawson and Pattengale. State of Indiana files Motion to Dismiss, this cause is ordered dismissed. The plea bargain may well have been entered. There is never any conviction or entry of judgment. That's clearly the standard.

\*     \*     \*     \*     \*     \*

Mr. Swartz:

Judge, I have a certified copy of the court's record which reflects that on the date that I mentioned that he, in court, entered a guilty plea as part of the plea bargain. That the court ordered a pre-sentence investigation report to be filed and that sometime after that was done, the Prosecutor moved to dismiss the charges against the Defendant. Uh, we, uh, are, the point of that is is that he is maintaining the only thing we're permitted to talk about is convictions. That if, in fact, he actually did this criminal activity and was in court and plead guilty to it, then what the Prosecutor was attempting to do was to dismiss the charges against him to clean him to clean him up a little better and make him a little bit better looking witness. But if, in fact, he came to court and plead guilty to the charge I think that that should fit within the standard as to reasonable evidence that the jury should be allowed to hear.

The Court:

Well, for what purpose are you going to introduce this, Mr. Swartz?

Mr. Swartz:

Again, to attack his credibility.

\*     \*     \*     \*     \*     \*

6. Dawson allegedly took an afghan, a bed-

spread, some blankets, and cookies.

The Court:

Well, if we're talking about impeachment, I think the law in Indiana is clear, we're talking about convictions.... Now, occasionally, you can get in this type of evidence for other purposes but that's not the direction we're going in and it's improper. If there's only one conviction, that's all there is." (Record at 262–264).

On Janner's direct examination, her attorney asked to make an offer to prove outside the presence of the jury, and the judge dismissed the jury. The following offer to prove was made and denied:

Mr. SWARTZ:

"Your Honor, I would offer to prove, with the testimony of this witness, that, uh, the Prosecutor's witness, Christopher Dawson did, in fact, a couple of months after this, burglarize her house and steal items out of it. And I would do that for two purposes. First of all, uh, to show a malice on his part toward the Defendant and I, which I would maintain according to Section 44.7 of the Indiana Trial Evidence Manual, that that is permissible evidence in Indiana. I also would offer for the purpose of proving the bias of that particular witness, Christopher Dawson, against this particular Defendant and, under normal circumstances in Indiana, while your rulings have been correct that I cannot prove specific acts for which there not [sic] been a felony conviction, *Herritan [Harrington] versus State* [ (1980), Ind.App.] says, at 413 NE2d 622, that if the purpose of proving the act is to show bias upon the part of the witness, that it is permissible, with the court's permission for me to prove specific illegal acts. And, furthermore, I also, in conjunction with that, would offer to prove with the testimony of Officer, uh, I forget his name, Rosenbaum of the City Police Department, that he took a statement from Chris Dawson within the next day or two after the occurrence in question about the burglary in which Chris Dawson confessed to his part in the burglary and theft, uh, and would offer to prove with his testimony that Chris Dawson has admitted to all that also.

BY THE COURT:

Well, I'll have to know a lot more about it, if you want to ask this witness or whatever?

MR. SWARTZ:

Pardon?

BY THE COURT:

I'll need to know the details if you want to go through the testimony.

MR. SWARTZ:

Yes.

Q. Somewhere along the way, was your house, after this occurrence we're talking about February the 8th, was your house burglarized?

A. Yes, it was.

Q. When was that?

A. April the 8th or 9th I think it was.

Q. Did you turn over certain evidence to the police department for them to use in their investigation?

A. Yes, I did.

Q. What was that?

A. Dishes and glassware that had fingerprints on them.

Q. Did the police department tell you that they had found fingerprints and identified them?

A. Yes they did.

Q. Who's?

A. Christopher Dawson's and Jeffrey Pattengale's.

Q. Now, do you have any specific reason to believe that this was done for some malicious purpose toward you personally?

A. Yes.

Q. What is that?

A. I refused to haul Chris around one night and, uh, according to his past actions, whenever you'd tell him no, he does something to get even with you.

Q. Have you known other people that he's done that to?

A. Yes, I do.

Q. Could you name some of those people?

A. Alice Talley for one.

Q. Okay.

A. Pat Smith for another.

Q. Who?

A. Pat Smith in Indianapolis for another.

Q. Okay. And he has done malicious things to them when they refused to do something for him?

A. That's right.

Q. Do you feel that that's, is that why you feel that he burglarized your house?

A. Yes.

Q. Well, why do you maintain that?

A. Well, for one reason, he says he took two blankets.

Q. Well, I don't mean that. I mean, why do you feel that he's lying?

A. Why do I feel he's lying?

Q. Yes. Is it because of his malicious intent toward you?

A. Yes, yes.

Q. Was there anything, how many different things in his testimony would you characterize as being a lie?

A. Well, there was quite a few of them. Am I supposed to tell them or what?

Q. Well, just give me a number. How many?

A. Eight or ten.

Q. Well, the crucial things about whether you knew about the illegal drugs and so forth. Was he lying about those?

A. Yes, sir.

Q. Why do you think that he was lying about those? Was it out of malice?

A. I would say so.
   MR. SWARTZ:
   That's all.
   BY THE COURT:
   Mrs. Janner ...

A. Yes?
   BY THE COURT:
   ... on this break in on your home on April 8th or 9th, what was taken?

A. There was several blankets and, uh, an expensive bedspread and an afghan.
   BY THE COURT:

Anything else?

A. No.
   BY THE COURT:
   Money?

A. No.
   BY THE COURT:
   Jewelry?

A. No.
   BY THE COURT:
   T.V. or appliances?

A. No.
   MR. SWARTZ:
   Your Honor, I believe that there was food that was not taken but was actually consumed inside the house but was not taken outside.
   BY THE COURT:
   How much food?

A. Uh, there was a couple packages of cookies and a box of cereal and some milk.
   BY THE COURT:
   Mr. Hainlen?

*CROSS EXAMINATION* [on issue of offer to prove]

MR. HAINLEN:

Q. Mrs. Janner, was there any sign of vandalism done to your house?

A. Pardon, sir?

Q. Any signs of vandalism?

A. Yes, the back door was kicked in.

Q. How long had it been since Chris had stayed there prior to that date?

A. Oh, that was in, uh, four or five months.

Q. Did you know this Jeff Pattengale at all?

A. He was a, a neighbor boy, back across the way.

Q. I want to make sure I'm correct on my time frame. You say this burglary or alleged burglary took place in April?

A. In April.

Q. You earlier testified that he'd been staying with you at the time of this transaction on February 8th, correct? Wasn't he living at your ...

A. No. He wasn't living at my place February the 8th. I said he was visiting there that night. He was there when I got home. He was a friend of Billy's.

Q. How long did he stay there on February 8th? Was he there for several days thereafter?

A. No, no.

MR. HAINLEN:

No further questions.

BY THE COURT:

Other than what you've been told by Rosenbaum or someone else, do you have any knowledge that Chris Dawson was the one that was in your house?

A. He told me. I mean, he, uh, he agreed and, uh, uh, Mr. Pattengale, Jeffrey's dad, paid for the repair of the door.

BY THE COURT:

Other than the door being kicked in, there wasn't any vandalism or ...

A. No, sir.

BY THE COURT:

... nothing destroyed?

A. No.

BY THE COURT:

You say that Chris Dawson told you that he was in your house and ate these cookies and so forth?

A. Okay, just a minute now because I saw him, or was it Jeff told me? I'm sorry. Jeffrey, Jeff told me. Jeff Pattengale told me.

BY THE COURT:

And Chris Dawson didn't admit it to you?

A. I haven't talked to Chris. I saw him at court but I didn't talk to him, except riding down in the elevator.

BY THE COURT:

Okay. I'm going to deny your request.

MR. SWARTZ:

Okay. Judge, would that apply to the police officer as well? To his testimony?

BY THE COURT:

Yes."

(Record at 355–361).

Janner contends that her offer to prove should have been allowed so as to permit the jury to have before it the relevant facts concerning Dawson's bias in favor of the State and his ill will toward her. She maintains that the circumstances surrounding the State's dismissal of the burglary charge should have been permitted to show Dawson's self interest in testifying against her. The facts should have been before the jury to show that the prosecutor—knowing Dawson was to be a witness for the State—dismissed the case even though Dawson was willing to plead guilty, in order to bolster his credibility (or, so that he could not be impeached for a burglary conviction). We agree.

Janner testified, and it is undisputed, that she undertook the journey merely as a convenience to her grandson who needed a ride. A trier of fact might be able to determine that she had information specific enough to involve her in the transaction; but, on the other hand, the conversations in the car might be considered non-incriminating.

The State's case was based almost entirely on the testimony of Dawson. His testimony was reinforced by the taped conversation, but that was partially inaudible. Under these circumstances, the whole crux of the case rested on Dawson's testimony.

Dawson was a paid informer, having received payment for his participation in the instant drug buy. The State had dropped a charge against him shortly before trial. He was allowed, over objection, to give his opinion whether Janner knew illegal activity was going on. Under these circumstances, the exclusion of evidence of bias was not harmless error. His interest in connection with the defendant should have been fully explored in order for there to have been a fair trial.

Our supreme court has recently held that it was reversible error to refuse to permit two co-offenders to be cross-examined about penalties they would have received had they not entered into plea agreements. In *Jarrett v. State* (1986), Ind., 498 N.E.2d 967, the trial court sustained the State's objection to the defendant's questions about the potential penalties his co-offenders would have faced had they not agreed to testify. The defendant appealed, alleg-

ing his questions were proper and necessary for the jury's determination of the weight and credibility of each of the witness's testimony. The supreme court agreed, finding there was not a substantial risk of prejudice to the State, but that significant harm could result if the jury was prevented from learning the extent of the benefit to the witness for this testimony. The court said that the State's wish to keep the sentencing information away from the jury was subordinate to the crucial role of full and proper cross-examination.

We recognize that here, unlike in *Jarrett,* the crucial witness is a paid informer and not a co-offender. Yet, in both instances the witnesses testified on behalf of the state based on an exchange of favors. We find that the need for full disclosure is no less crucial here than it was in *Jarrett.* The record should have been clear as to the relationship between the prosecutor and Dawson, and between the defendant and Dawson. Absent this data, the jury did not have the necessary information from which to make a meaningful evaluation of Dawson's credibility. It is essential to the jury's fact finding role that bias and prejudice of a witness be exposed so that it can weigh the testimony of a witness and insure a fair trial. As our supreme court has stated "[t]he exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Jarrett, supra* at 968 (citing *Davis v. Alaska, supra* ). For these reasons, it was error for the trial court to exclude the evidence, and we reverse.

ROBERTSON and CONOVER, JJ., concur.