v.

**STATE of Indiana, Appellee–Respondent.**

No. 48A04–0510–PC–572.

Court of Appeals of Indiana.

Dec. 14, 2006.

Susan K. Carpenter, Public Defender of Indiana, William D. Polansky, Deputy Public Defender Indianapolis, IN, for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General Indianapolis, IN, for Appellee.

## OPINION ON REHEARING

SHARPNACK, Judge.

In our memorandum decision handed down on June 9, 2006, we affirmed. Appellant J.J. has petitioned for rehearing stating his issue as follows: whether this court erred by concluding that J.J. was not denied effective assistance of trial counsel.[1] We grant J.J.'s petition for rehearing, vacate our memorandum decision of June 9, 2006, and reverse.

The relevant facts follow. M.E., a fifteen-year-old, lived with his parents, Dianne and Kimothy Fetty, in Anderson, Indiana. On March 20, 2000, after school, M.E. went to J.J.'s house, which was separated from M.E.'s house by a muddy cornfield. M.E., J.J., and D.S. drove around and then went to M.E.'s house to get some gas money. M.E., J.J., and D.S. went into

---

1. The offense was committed on March 21, 2000. J.J. was born on May 15, 1983, and was less than seventeen years old when the offense occurred. The record reveals that J.J. was waived to adult court on a previous charge and "the filing of the Instant Offense in adult court was due to the original waiver order." Record of Proceedings at 34.

Dianne and Kimothy's room where M.E.'s parents kept a coffee can with some change in it in a cabinet on the top of a dresser. M.E. found eight one hundred dollar bills sitting on top of a pile of change. M.E. laid the $800 aside and looked for some more change. J.J. picked up the $800, looked at it, and counted it. M.E. put some change in his pocket, put the $800 back in the can, and placed the can in the cabinet. The three boys left and put some gas into D.S.'s car. M.E. stayed with J.J. and D.S. for less than an hour before returning home. M.E. remained at the house all night.

The next morning, M.E. missed the bus for school. Kimothy came home at nine o'clock a.m. and took M.E. to school. The ride took five minutes. Kimothy then returned home, locked the house, and left for work. Kimothy left work at 2:30 p.m. and went to a friend's house until he picked up M.E. from school at around 4:20 p.m. Kimothy dropped M.E. off at home and went back to his friend's house. Kimothy returned home at around 6:10 p.m. because M.E. needed to be at a band concert by 6:30 that evening. Kimothy dropped M.E. off at the band concert and returned to his friend's house because his wife was out of town on a business trip.

Around 7:30 p.m., Kimothy arrived home to find Dianne had returned from her business trip. Dianne noticed that a chain had been ripped off of a ceiling fan light in the bedroom and change was all over the floor. There was also mud on the bed. Kimothy took his change out of his pocket, got the can from the cabinet, put the change in the can, and discovered that the $800 was missing. After realizing that the money was missing, Kimothy discovered that the basement door, which J.J. and D.S. always used when visiting, was unlocked.

When M.E. returned home, his parents were sitting in the living room and asked if anyone had been around the house. M.E. told his parents that J.J. and D.S. were at the house the day before. M.E.'s parents told him that the $800 was missing from the coffee can, and M.E. told his parents that "it was probably [J.J.] because he was the only one that knew it was there, [J.J.] and [D.S.]." Record of Proceedings at 92.

That same day, J.J. and D.S. went to Dave's Auto Service to buy a car. They both talked to David Lines during the transaction. While it was D.S. that filled out the paperwork and signed the receipt, J.J. handed $800 to Lines. M.E. called J.J.'s house and told Andrea Johnson, J.J.'s mother, about the theft. Two days later, J.J.'s mother returned the car to Lines via her ex-husband. Lines accepted the car and returned the money, which J.J.'s mother then gave to Kimothy.

The State charged J.J. with burglary as a class B felony[2] and theft as a class D felony.[3] In late March 2000, Sergeant Brian Bell of the Madison County Police Department attempted to arrest J.J. on information that he was at an address on East Sumner Lake Drive. At the residence, Sergeant Bell knocked on the door, and J.J. answered the door. Sergeant Bell addressed J.J. by his first name, and initially J.J. did not respond and then said his name was Jeff. J.J. continued to insist that he was not J.J. After forty-five minutes to an hour, Sergeant Bell called Detective Hanna, who knew J.J., to the scene, and Detective Hanna confirmed J.J.'s identity.

The prosecutor requested the trial court to grant use immunity as a witness to D.S., and the trial court granted the prosecutor's request. During opening statement,

---

**2.** Ind.Code § 35–43–2–1 (2004).

**3.** Ind.Code § 35–43–4–2 (2004).

the prosecutor said, "You're going to hear from [D.S.] and I tell you right now [D.S.] is going to sit there and he is going to . . . he is going to lie and lie and lie. And he's going to lie when he's confronted with the truth. We've taken his statement a couple of times now and I don't think the truth is in this boy. He makes things up as he goes along." Record of Proceedings at 74. D.S. testified that he and J.J. went to Kimothy and Dianne's house to get the money, J.J. went into the house and took the money, and then D.S. bought a car with the money. Neither the prosecutor nor J.J.'s counsel informed the jury that D.S. was testifying pursuant to a grant of use immunity. During closing argument, the prosecutor stated:

> And [D.S.] was certainly more candid today when he testified in the sense that he cooks himself today. . . . And he told you today, he looked at you and told you, "yes, I did know what was going on." And that's what he didn't want to do yesterday but he's certainly been more candid. He is . . . he has cooked himself on this burglary. Put himself right in the soup. Right in the pie. And that's where he's going to stay here for awhile until we decide what to do with him.

*Id.* at 186–187.

M.E. testified that J.J.'s mother called and told his parents that J.J. had just bought a car with $800. J.J.'s counsel did not object.

J.J. did not testify at trial. During closing argument, the prosecutor stated:

> The bottom line is though have you heard any other evidence to contradict that story? Has anybody else took [sic] that witness stand and looked at you the

way [D.S.] did and contradicted what he said as far as what happened? And you haven't.

*Id.* at 194–195. J.J.'s defense counsel did not object. The jury found J.J. guilty as charged. The trial court sentenced J.J. to fifteen years in the Indiana Department of Correction on the burglary conviction and three years on the theft conviction. The trial court ordered that the sentences be served concurrently. The trial court also ordered that five years be executed at the Madison County Work Release Facility and suspended ten years.

In his direct appeal, J.J. argued that the trial court abused its discretion in sentencing him. We affirmed. *[J.J.] v. State,* No. 48A02–0009–CR–597, slip op. at 2, 8, 745 N.E.2d 920 (Ind.Ct.App. March 21, 2001). J.J. filed a pro se petition for post-conviction relief. J.J. later filed an amended petition for post-conviction relief alleging that he received ineffective assistance of trial counsel because trial counsel: (1) failed to object to hearsay; (2) failed to elicit exculpatory testimony from J.J.'s mother; (3) failed to inform the jury that D.S. was testifying pursuant to a grant of use immunity; (4) failed to object to prosecutorial misconduct in the form of a comment during closing argument on the defendant not testifying; and (5) failed to object to an erroneous jury instruction that included a mandatory presumption.[4]

The post-conviction court entered the following findings of fact and conclusions thereon:

### FINDINGS OF FACT

1. On March 21, 2000, [J.J.], along with [D.S.], broke and entered the dwelling of Kimothy Fetty and stole

---

4. On appeal, J.J. does not argue that his trial counsel was ineffective for failing to object to an erroneous jury instruction.

$800.00 in United States currency. They then purchased a car with the proceeds of the burglary and theft.

2. [J.J.] was convicted by a jury in July, 2000, and sentenced to a fifteen year term.. [sic]

3. [J.J.] was represented at trial by Eric Saltzmann.

4. [J.J.] appealed his conviction, alleging sentencing error as his sole ground for relief. He was represented on appeal by Christopher Cage. His sentence was affirmed.

5. On December 11, 2004, [J.J.] filed an amended Petition for Post–Conviction Relief. An evidentiary hearing on his petition was held on March 6, 2005.

6. [J.J.] has alleged multiple grounds for relief: Ineffective assistance of trial counsel for failing to object to hearsay testimony that an Andrea Johnson told [M.E.'s] parents that [J.J.] had purchased a vehicle, [i]neffective assistance of trial counsel for failing to inform a jury that [D.S.]'s testimony was immunized, [i]neffective assistance of trial counsel for failing to introduce a receipt for the vehicle showing [D.S.]'s name, ineffective assistance of trial counsel for failing to object to the prosecutor's characterization of the evidence at trial as "uncontradicted," and ineffective assistance of trial counsel for failing to object to a jury instruction stating "Opening an unlocked door constitutes a break-in as does pushing an open door which is slightly ajar."

### CONCLUSIONS OF LAW

1. In evaluating a claim for ineffective assistance of appellate counsel, the Court must inquire first if counsel's performance was reasonable considering all of the circumstances. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 80 L.Ed.2d 674 (1984). If the Court finds that counsel acted unreasonably, it must further inquire if the decision reached would reasonably likely have been different but for the error. *Id.* at 697, 104 S.Ct. 2052

2. Saltzmann was not ineffective for failing to object to the testimony of Andrea Johnson. Even if the objection should have been made, the isolated testimony does not prejudice the defense to the extent contemplated in *Strickland.*

3. Saltzmann was not ineffective in failing to elicit the fact that [D.S.]'s testimony was immunized. Even if the information should have been before the jury, the purpose would have been to impeach [D.S.]. The jury surely would have heard that immunity does not protect against a prosecution for perjury. The trial prosecutor described [D.S.] as a liar, and the jury had sufficient information and opportunity to evaluate [D.S.]'s credibility. [J.J.] was not prejudiced to the extent contemplated in *Strickland.*

\* \* \* \* \* \*

5. Saltzmann was not ineffective for failing to object to the Prosecutor's characterization of the evidence as uncontradicted. The objection would not have been sustained, as there was no direct comment on [J.J.]'s failure to testify, but merely a characterization of the evidence as a whole. The jury was instructed that the burden of proof was solely on the State, and Saltzmann reminded the jury of that in his closing.

6. Saltzmann was not deficient for failing to object to a jury instruction clarifying the breaking element for the jury. The instruction was deemed appropriate by the appellate courts at the time of the trial, and was disapproved four years after the trial. Further, the fact that a burglary had occurred was not at issue in the trial. The sole issue was the identity of the perpetrators. Any error would therefore be harmless.

7. All issues as to ineffective assistance of counsel were waived because they were available but not raised on direct appeal.[5]

8. Even if Saltzmann was ineffective on each ground above, the cumulative effect of the issues does not prejudice [J.J.] to the extent contemplated by *Strickland,* given the totality of the circumstances.

9. The law is with the State and against [J.J.].

Wherefore, the Court denies [J.J.]'s Petition for Post–Conviction Relief. Appellant's Appendix at 107–110.

 Before discussing J.J.'s allegations of error, we note the general standard under which we review a post-conviction court's denial of a petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State,* 810 N.E.2d 674, 679 (Ind.2004); Ind. Post–Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with Indiana Post–Conviction Rule 1(6). "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law.[6] *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

---

**5.** We disagree with the trial court's conclusion that "[a]ll issues as to ineffective assistance of counsel were waived because they were available but not raised on direct appeal." Appellant's Appendix at 109. The Indiana Supreme Court held that "a Sixth Amendment claim of ineffective assistance of trial counsel, if not raised on direct appeal, may be presented in postconviction proceedings." *Woods v. State,* 701 N.E.2d 1208, 1220 (Ind.1998), *reh'g denied,* cert. *denied,* 528 U.S. 861, 120 S.Ct. 150, 145 L.Ed.2d 128 (1999).

**6.** J.J. argues that "cautious appellate review is warranted" because the trial court "simply adopted verbatim the State's proposed findings and conclusions." Appellant's Brief at 8. The Indiana Supreme Court has acknowledged that a trial court's verbatim adoption of a party's proposed findings may have important practical advantages and has expressly declined to prohibit the practice. *Prowell v. State,* 741 N.E.2d 704, 708–709 (Ind.2001). However, the wholesale adoption of one party's findings results in an "inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." *Id.* at 709. The Indiana Supreme Court has also held that "although we do not encourage post-conviction court judges to adopt wholesale the findings and conclusions of either party, we decline to find bias solely on that basis. The critical inquiry is whether the findings adopted by the court are clearly erroneous." *Saylor v. State,* 765 N.E.2d 535, 565 (Ind.2002), *reversed* on *other grounds* on *reh'g,* 808 N.E.2d 646 (2004).

The sole issue on rehearing is whether J.J. was denied the effective assistance of trial counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Ben–Yisrayl v. State,* 729 N.E.2d 102, 106 (Ind.2000) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), *reh'g denied), reh'g denied,* cert. *denied,* 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *French v. State,* 778 N.E.2d 816, 824 (Ind.2002). To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State,* 748 N.E.2d 853, 854 (Ind.2001). Failure to satisfy either prong will cause the claim to fail. *French,* 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

■ Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. *Timberlake v. State,* 753 N.E.2d 591, 603 (Ind.2001) (internal citations omitted), *reh'g denied,* cert. *denied,* 537 U.S. 839, 123 S.Ct. 162, 154 L.Ed.2d 61 (2002). A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.*

J.J. argues that his trial counsel was ineffective for: (A) failing to inform the jury that D.S. had been granted use immunity; (B) failing to object to M.E.'s hearsay testimony that J.J.'s mother told M.E.'s parents that J.J. had just bought a car; (C) failing to call J.J.'s mother as a defense witness; and (D) failing to object to the prosecutor's comments in closing argument regarding J.J.'s failure to testify. Because we reverse based on the trial counsel's failure to inform the jury that D.S. had been granted use immunity, we will not address the other arguments.

A. *Failure to Inform the Jury of Use Immunity*

■ J.J. argues that trial counsel was ineffective for failing to inform the jury that D.S. had been granted use immunity. The trial court granted the prosecutor's request to grant use immunity as a witness to D.S. in the following order:

After argument of counsel, the Court finds as follows:

That [D.S.] shall be granted immunity and instructs that any evidence [D.S.] gives in this cause or any evidence derived from that evidence, may not be used in any criminal proceeding against witness [D.S.] unless the evidence is volunteered by him or is not responsive to a question by the Prosecuting Attorney[.]

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that [D.S.] is given use immunity and that any evidence that he gives in this hearing or evidence derived from that evidence may not be used in any criminal prosecution against [D.S.] unless the evidence is volunteered by him, or is not responsive to a question by the Prosecutor, except for a prosecution for Perjury.

Record of Proceedings at 25.

■ Although there may be strategic reasons to not reveal to the jury that D.S. had been given use immunity, trial counsel testified at the post-conviction hearing that he had no strategic reason for not informing the jury of the use immunity and recognized it would be a good defense strategy to inform the jury.

> Certain basic principles apply to an accomplice's testimony. Such testimony is highly suspect and should be strongly scrutinized by the trier of fact. *Samuels v. State* (1987), Ind.App., 505 N.E.2d 120, 122. The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Jarrett v. State* (1986), Ind., 498 N.E.2d 967, 968. To effectively analyze a witness's credibility, a jury should have before it all the relevant circumstances which cause or induce the witness to testify, including the rewards for such testimony and any promises by the State or prosecuting attorney to grant immunity. *Watson v. State* (1987), Ind., 507 N.E.2d 571, 572; *Samuels, supra.* It is essential to the jury's fact finding role any bias and prejudice of a witness be exposed so that the jury can weigh the witness's testimony and a fair trial is insured. *Janner v. State* (1988), Ind. App., 521 N.E.2d 709, 716. This disclosure must include all relevant circumstances which induced the witness's testimony. *Samuels, supra.*

*Hamner v. State,* 553 N.E.2d 201, 203 (Ind.Ct.App.1990). We find that J.J.'s trial counsel's performance was deficient because trial counsel failed to inform the jury of the relevant circumstances that induced D.S. to testify.

■ We next address whether trial counsel's performance prejudiced J.J. To succeed on such a claim, J.J. must demonstrate a reasonable probability that the result of the proceeding would have been different but for defense counsel's inadequate representation. *See Ben–Yisrayl,* 729 N.E.2d at 106. The State argues that "[e]ven if [D.S.] had not testified, no reasonable jury would have exonerated [J.J.] in light of [J.J.]'s presence when the money was shown the prior day, [J.J.]'s presence during the car purchase and handling of the money, [J.J.]'s mother repaying Fetty's loss, and [J.J.] denying his own identity at the time of the arrest." Appellee's Brief at 12.

J.J. argues that the prosecutor's closing argument sought to bolster D.S.'s credibility by emphasizing that he was incriminating himself by his testimony. During closing argument, the prosecutor stated:

> I don't know what to think about [D.S.] at this point and time. I don't know what to think about that. I don't ... I don't ... I think a lot of you probably are wondering about him. He, you know, he was certainly more candid today than he was yesterday. That got him landed in jail. You heard about that. Because he got on ... as a matter of fact he sat right there yesterday and took his deposition. That's the reason we didn't start yesterday afternoon. We had to take care of that little job first. And he sat there and lied to us under questioning.... Well, he professed to us yesterday that he didn't know that [J.J.] was going to commit a burglary. And he just wasn't truthful. I recognized it. Mr. Saltzmann recognized it. Judge Newman recognized it and I asked Judge Newman yesterday afternoon when you guys weren't here, "Judge, he's lied to us, put him in jail." And Judge Newman agreed and Judge Newman put him right where he should be. Right over there in the Madison County Jail. Now, he came in today and I would presume a night of staring at

the concrete walls over there had a little ... had a little effect on what he'd done. And he was certainly more candid today when he testified in the sense that he cooks himself today.... And he told you today, he looked at you and told you, "yes, I did know what was going on." And that's what he didn't want to do yesterday but he's certainly been more candid. He is ... he has cooked himself on this burglary. Put himself right in the soup. Right in the pie. And that's where he's going to stay here for awhile until we decide what to do with him.

Record of Proceedings at 185–187.

Although the circumstantial evidence would be sufficient to support a conviction, it is also open to inferences of nonguilt. Therefore, the credibility of D.S. is of great consequence to a jury's consideration of the case. *See Birkla v. State,* 263 Ind. 37, 42 323 N.E.2d 645, 648 (Ind.1975) ("[W]hen the prosecution relies upon the testimony of a coconspirator to obtain conviction of an accused, the coconspirator's credibility is an important issue in the case."), *cert. denied,* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77 (1975). Here, we cannot agree with the post-conviction court that J.J. was not prejudiced, especially in light of the prosecutor's comments that D.S. had "cooked himself" by his testimony that he had participated in the crime with J.J. The clear import of the prosecutor's assertions is that D.S. is credible as to J.J.'s participation because D.S. will suffer for his own admission, but the precise benefit of use immunity is to prevent the witness from suffering by reason of his testimony. Thus, the post-conviction court erred when it concluded that J.J. failed to show that there is a reasonable probability that the result of the proceeding would have been different. *See Smith v. State,* 721 N.E.2d 213, 219 (Ind.1999) (holding that "[b]ecause [the witness]'s testimony was essential to the State's case ... we cannot conclude

that this restriction on exploring [the witness]'s bias was harmless beyond a reasonable doubt"); *Newman v. State,* 263 Ind. 569, 571–572, 574, 334 N.E.2d 684, 686–688 (1975) (holding that the prosecution's non-disclosure of evidence regarding an agreement of leniency made with a prosecution witness, an accomplice of the defendant, constituted reversible error). Consequently, the post-conviction court erred by finding that J.J. received effective assistance of trial counsel.

For the foregoing reasons, we grant rehearing and reverse the post-conviction court's denial of J.J.'s petition for post-conviction relief.

Reversed.

NAJAM, J. concurs.

ROBB, J. concurs with separate opinion.

ROBB, Judge, concurring with separate opinion.

I concur in the majority's opinion on rehearing, but write separately to address an additional area of concern: the State's calling of a witness it expected to give perjured testimony.

Even before reaching the question of whether J.J.'s counsel was ineffective for failing to inform the jury that D.S. was testifying pursuant to a grant of use immunity, I would note that J.J.'s counsel should have objected to the State calling D.S. at all. As noted by the majority, during the State's opening statement, the prosecutor said, "You're going to hear from [D.S.] and I tell you right now [D.S.] is going to sit there and he is going to ... he is going to lie and lie and lie. And he's going to lie when he's confronted with the truth." Record of Proceedings at 74. During closing arguments, the State said, "[D.S.] sat right there yesterday and [we] took his deposition.... [H]e professed to

us yesterday that he didn't know that [J.J.] was going to commit a burglary. And he just wasn't truthful. . . . And he was certainly more candid today when he testified. . . ." *Id.* at 185–86.

Indiana Evidence Rule 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." However, Indiana Code section 34–45–4–1 provides that except in certain circumstances, "the party producing a witness shall not be allowed to impeach the credibility of the witness by evidence of bad character." Ind.Code § 34–45–4–1(a). In other words, "a party is forbidden from placing a witness on the stand when the party's sole purpose in doing so is to present otherwise inadmissible evidence cloaked as impeachment." *Appleton v. State,* 740 N.E.2d 122, 125 (Ind.2001). This has long been the rule in Indiana. In *Slayton v. State,* 481 N.E.2d 1300 (Ind.1985), our supreme court quoted a case from 1892, in which the court stated: "The rules of practice will not permit a party to call a witness closely connected with the [adversary] cause, and from whom he has [no] reason to expect favorable testimony, [and] then to assail the character of the witness by impeachment." *Id.* at 1303 (quoting *Diffenderfer v. Scott,* 5 Ind.App. 243, 32 N.E. 87, 89 (1892)). To determine whether the rule allowing impeachment of one's own witness has been abused, we consider whether the party examined the witness for the primary purpose of placing before the jury otherwise inadmissible evidence. *Julian v. State,* 811 N.E.2d 392, 397 (Ind.Ct.App.2004), *trans. denied.*

In this case, the State did not actually impeach D.S. during D.S.'s testimony. However, it is clear from the State's comments during the hearing on its petition to grant D.S. use immunity and from its opening statement and closing argument that it fully expected and intended to impeach D.S. from the moment it called him to the stand and it was only D.S.'s unexpected truthful testimony that kept the State from doing so. In discussing with the court its petition for use immunity for D.S. prior to the beginning of the trial, the State said:

I would represent to the Court the testimony that I'm going to put on I don't believe . . . actually, I'm not . . . I'm not one hundred percent sure what to believe and what not to believe. I believe a good part of it is impeachable. I believe a good part of it is probably not true. And I would submit to the Court that I won't be presenting it as . . . I won't be submitting to the jury that they should rely on all this boy's testimony to be true. But there are parts of his testimony that do fit into a circumstantial puzzle that make my case.

Record of Proceedings at 54. The State informed the jury during its opening statement that D.S. was a liar, and expressed during closing argument that D.S.'s testimony was "candid," but not what it had expected when it called him to the stand. The State should never have been allowed to call D.S. to the stand with the stated intention to impeach his expected testimony, and J.J.'s counsel was ineffective for failing to object to the State doing so.

With that addition, I agree with the majority's analysis of J.J.'s counsel's failure to ensure that the jury was informed that D.S. had been granted use immunity for his testimony, and therefore concur in the majority's opinion.