**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 27 2012, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**HILARY BOWE RICKS**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID SHANE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 68A01-1202-PC-74 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE RANDOLPH CIRCUIT COURT
The Honorable Jay L. Toney, Judge
Cause No. 68C01-0506-PC-43

**September 27, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

David Shane appeals the denial of his petition for post-conviction relief. We affirm.

## Issues

Shane raises two issues, which we restate as:

I.  whether he received ineffective assistance of trial counsel; and

II. whether he received ineffective assistance of appellate counsel.

## Facts

Shane was charged with and found guilty of murder, conspiracy to commit murder, Class C felony feticide, and Class C felony assisting a criminal. The relevant underlying facts are:

> On the morning of July 28, 1994, a neighbor of Nicole Koontz found her dead in the living room of her trailer. Koontz had been dead for several hours from a gunshot wound to the head, inflicted at close range. She had been shot three times through a pillow with a .25 caliber gun. As a result of her death, her 29 week old fetus also died. Two bullet casings and one live round of ammunition from a .25 caliber handgun were found at the scene.
>
> A police investigation ensued. Robert Hicks, the boyfriend of Koontz, and his best friend and business partner, David Shane, were both questioned during the course of this investigation. During the initial interviews, Hicks and Shane recounted almost identical stories. Shane and Hicks had worked until 2:00 p.m. at a painting job. They returned to Shane's home and worked on the yard. They drank beer, smoked pot, took showers, and eventually left home to go to two bars. They left the second bar at around 1:00 a.m., went to Taco Bell and returned home around 1:30 a.m., at which point they ate and

2

went to bed.  The next morning, they went to Hardees, and were on their way to a paint job when Hicks received three pages in a row from Tammy Hodson.  Hicks called Hodson and learned of Koontz's death, at which point both men went to Koontz's trailer park.  During the initial interrogation, Shane at first denied having a .25 caliber handgun, but quickly retracted, admitting that he kept a .25 caliber in a brief case in his Suburban.  He claimed the gun had sentimental value, and had been used for target practice at the residence of Hicks's parents.  He consented to a search of his truck, in which a .25 caliber casing was found.  A subsequent search of Hicks's parents' residence turned up three spent shell casings.

On August 8, Shane returned to the police station and changed his former statement.  At this point, he told the officer that he had concocted the previous story with Hicks.  He now stated that after Hicks and Shane returned home from Taco Bell, Hicks left again to go to Koontz's to have sex.

On May 4, 1995, Shane was again questioned.  At this point, he had been arrested for feticide and murder, and he again changed his story.  This time, he claimed that after arriving home from Taco Bell at around 11:00 p.m., Shane drove Hicks to Koontz's house on a motorcycle.  They parked in the back, and Hicks told Shane to wait for him while he checked to see if Koontz would have sexual intercourse with him.  Shane watched Hicks go up to the door and go in.  He heard nothing inside the trailer.  Hicks came out of the house a couple of minutes later, acting flustered, and they returned home around 1:30 a.m.  The next morning, on the way to work, Hicks told Shane that something bad had happened, pulled out a gun, and told Shane that he had to get rid of it.  They drove to a remote country pond and disposed of the gun.

Shane identified the pond in which the gun had been thrown.  Investigators recovered the gun, and subsequent testing showed that the bullets and casings from Koontz's house, Shane's car, and Hicks's parents' residence were all fired from this gun.  The autopsy revealed that Koontz had probably died in the early morning of July 28, 1994, several hours before her body was discovered.  An investigation of the crime scene

3

revealed no evidence of robbery, but fresh marks on the door frame suggested a forced entrance.

Shane and Hicks were childhood friends and owned a business together. Hicks often lived with Shane and each of them served as best man in the other's wedding. Shane and Hicks spent most of their free time together, and had a close relationship.

At trial, several witnesses testified about the violent relationship between Hicks and Koontz. Hicks at one point became so violent that Koontz was hospitalized. Another time, Koontz stabbed Hicks in the hand. Several witnesses testified that Koontz was afraid of Hicks, telling her friends "[i]f I ever get killed in my living room on my couch [ ] Rob Hicks probably has something to do with it." Elizabeth Bentley, a neighbor, testified that the night before the murder, Koontz came over to her house to complain about an argument with Hicks about the baby's room. Koontz told Bentley that she became so mad that she had wet her pants.

Jessica Daniels, a close friend of Shane's, testified as to a conversation between herself, Shane and Hicks two nights before the murder. Hicks began to talk of killing Koontz, and said "yeah, you tell her about it, David." Shane told Daniels that Hicks wanted to go and blow "Nickie's" head off one night, and wanted Shane to take him there.

Amy Case, Shane's ex-wife, also testified at Shane's trial. Case testified that Shane hated Koontz. She said that she had overheard a conversation between Hicks and Shane in which Hicks said he was so mad at Koontz, he wanted her dead, and Shane responded "it could be done, we could do that." She also recounted an overheard conversation between Shane and Hicks on how to commit the "perfect murder" and get away with it.

Shane v. State, 716 N.E.2d 391, 394-96 (Ind. 1999). At the conclusion of the May 9, 1997

trial, a jury found Shane guilty as charged. Convictions were entered on each count, and

Shane was sentenced to sixty years, with four years suspended, for murder, fifty years, with four years suspended, for conspiracy to commit murder, eight years, with four years suspended, for feticide, and four years for assisting a criminal. The trial court ordered the conspiracy and feticide sentences to be served concurrent to the murder sentence and ordered the assisting a criminal sentence to be served consecutive to the murder sentence, for a total executed sentence of sixty years.

Shane filed a direct appeal arguing that there was insufficient evidence to support his convictions, that the trial court erred in admitting certain evidence, and that his pre-trial jail time was improperly credited against his sentence. In a 3-2 decision, our supreme court rejected Shane's arguments and affirmed his convictions and sentence. See Shane, 716 N.E.2d at 394.

On June 16, 2005, Shane filed a petition for post-conviction relief, which was amended in 2009. On February 12, 2012, after a hearing, the post-conviction court denied Shane's petition. Regarding Shane's claims of ineffective assistance of trial and appellate counsel, the trial court found:

> 14. That at trial, counsel failed to object to final instruction sixteen, which advised the jury that prior inconsistent statements could be used to impeach the witness, and also as evidence in determining the guilt or innocence of the Defendant.
>
> 15. That the jury may have been misled, and may have used prior inconsistent statements as substantive evidence.
>
> 16. That there was sufficient other evidence to support the convictions of the Petitioner (Defendant below), such that the giving of the inaccurate portion of final instruction sixteen was harmless error.

17. Trial counsel did not make the jury aware that Robert Hicks was receiving use immunity for his testimony.

18. That Robert Hicks' testimony essentially laid the foundation for the admissibility of certain photographs and/or videotapes.

19. That trial counsel made a strategy decision not to raise the issue of use immunity.

20. The Petitioner was not prejudiced by trial counsel's strategy decision not to raise the issue of use immunity.

21. Trial counsel did not argue Lisa Waddell's testimony regarding Petitioner's trucks' bright lights corroborated a portion of Petitioner's statement.

22. Petitioner had never discussed this issue with counsel prior to the trial.

23. Trial counsel did not attempt to make this point with the jury, as Waddell's testimony and Petitioner's statement did not necessarily point to the innocence of the Petitioner.

24. There was no testimony by Amy Case in the Hicks trial to the effect that Hicks had talked about how to commit the perfect murder, as the Judge prohibited her testimony on the subject; therefore, trial counsel could not have impeached Amy Case on this issue.

25. Trial counsel failed to object to some testimony regarding Hicks' statements to police.

26. Petitioner believes that Hicks' statements, although actually denials of guilt, placed Petitioner with Hicks, providing a link used by the State to support the conspiracy theory.

27. There was ample evidence other than Hicks' statements to show the close relationship between Hicks and the Petitioner, such that Hicks' statements were only cumulative as to this fact, and did no actual harm to Petitioner.

6

28. Appellate counsel failed to argue that the trial court erred when it permitted testimony, over objection, that the victim was afraid of Hicks and/or Petitioner prior to her death.

29. That the deceased's fear of Hicks may have been an advantage to Petitioner at trial, since the evidence showed that Hicks was the actual killer.

30. That there was ample evidence to support the convictions, without evidence regarding decedent's fear of Hicks and/or the Petitioner.

App. pp. 39-40. Shane now appeals.

## Analysis

"The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." Kubsch v. State, 934 N.E.2d 1138, 1144 (Ind. 2010). Because a petitioner appealing the denial of post-conviction relief is appealing from a negative judgment, to prevail on appeal, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Id. Further, although we do not defer to a post-conviction court's legal conclusions, the court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. Id.

### I. Ineffective Assistance of Trial Counsel

"To establish a post-conviction claim alleging the violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish before the post-conviction court the two components set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct.

7

2052, 80 L.Ed.2d 674 (1984)." Id. at 1147. First, a defendant must show that counsel's performance was deficient by establishing that counsel's representation fell below an objective standard of reasonableness and that "'counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed to the defendant by the Sixth Amendment.'" Id. (quoting Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). A defendant must also show that the deficient performance prejudiced the defense by establishing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. "Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." Id.

### A. Jury Instruction

Shane argues that trial counsel did not object to Final Instruction No. 16, which he asserts was an incorrect statement of the law because it permitted the jury to consider prior inconsistent statements and as substantive evidence. Specifically, the instruction provided:

> Prior inconsistent statements are defined as statements made by the witness out of Court which differ from his testimony during this trial. Prior inconsistent statements may be considered by you for two purposes. You may use them to impeach the capacity for truthfulness of the witness who made the inconsistent statements. You may also consider the out-of-court statements as evidence in determining the guilt or innocence of the crime charged.

R. p. 190. Shane argues that, after Modesitt v. State, 578 N.E.2d 649 (Ind. 1991), "prior inconsistent statements could only be used for impeachment." Appellant's Br. p. 13.

8

The State agrees that in <u>Modesitt</u> our supreme court overturned the long-established rule that prior inconsistent statements could be used for impeachment and as substantive evidence. <u>Modesitt</u>, 578 N.E.2d at 652 (overruling <u>Patterson v. State</u>, 263 Ind. 55, 324 N.E.2d 482 (1975)). The State argues, however, that <u>Modesitt</u> permitted the use of prior statements as substantive evidence "if the declarant testifies at trial and is subject to cross examination concerning the statement, and the statement is (a) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . . ." <u>Id.</u> at 653-54. In 1994, after <u>Modesitt</u> was decided, the Indiana Rules of Evidence were adopted, and Indiana Evidence Rule 801(d)(1)(A) accomplished "by Rule what <u>Modesitt</u> did by decision." <u>Humphrey v. State</u>, 680 N.E.2d 836, 839 (Ind. 1997).

Shane does not acknowledge this exception announced in <u>Modesitt</u> or Indiana Evidence Rule 801(d)(1)(A). Instead, he asserts that trial counsel had a duty to know the relevant law and apply it to the case.[1] Even if trial counsel was not aware that <u>Patterson</u> had been overruled, we are not convinced that Shane was prejudiced by the instruction.

Shane's prejudice argument is based on the testimony of Jessica Daniel. At trial, Daniel testified that she and Shane were close friends and that she was with Shane and Hicks two days before the murder. Daniel testified that Hicks brought up the subject of killing

---

[1] Shane does not make any argument regarding whether an objection to this jury instruction would have been sustained. See <u>Baer v. State</u>, 942 N.E.2d 80, 97 (Ind. 2011) (observing that a post-conviction court's decision regarding ineffective assistance for failure to object to instructions will be reversed only if the appellant can show that the trial court was compelled as a matter of law to sustain the objection). However, because the post-conviction court found the failure to object may have misled the jury, resulting in the use of the prior inconsistent statement as substantive evidence, we resolve this argument on the prejudice prong of <u>Strickland</u>.

Koontz, that Hicks "wanted to go and blow Nickie's f***ing head off one night[,]" and that Hicks wanted Shane to take him there. R. p. 585. On cross-examination, Daniel testified that Shane's reaction was to shake his head like it was crazy. On redirect, the prosecutor asked Daniel if she testified before the grand jury that Shane was the one who made the statement about wanting to kill Koontz. Daniel stated that she could not remember. The prosecutor then questioned Daniel about her testimony at Hicks's trial indicating that she could not remember if Shane actually made the statement. Daniel explained that it was during Hicks's trial that she remembered who made the statement. The prosecutor then asked, "So what you are saying now is that you might have told the grand jury that [Shane] made the statement but at the Hicks trial when you saw [Hicks] you remembered that it was [Hicks] that made the statement." Id. at 588-89. Daniel replied, "I am saying that I don't remember what I told in the grand jury. I don't remember what I said. I do remember what I said in the Hicks trial and I know who made the statement that day, June whatever, it was [Hicks]." Id.

According to Shane, under the erroneous instruction, the jury could have considered Daniel's "original version" as substantive proof of Shane's desire that the victim be killed, affecting its consideration of whether Shane knowingly participated in Koontz's death. Appellant's Br. p. 14. This argument fails for two reasons. First, it is not clear from the evidence before us that Daniel actually told the grand jury that Shane made the statement. What is clear is that Daniel did not remember what she told the grand jury and that at Hicks's trial she remembered that Hicks had made the statement. Further, to the extent the prosecutor's questions could be construed as establishing that Daniel made an inconsistent

10

statement during her grand jury testimony, such a statement appears to fall within the Modesitt exception because Daniel testified at trial and was subject to cross-examination concerning her grand jury testimony, which was given under oath subject to the penalty of perjury.[2]

Shane does not direct us to any other testimony to which the instruction could have applied. Thus, even if trial counsel's failure to object to the instruction fell below an objective standard of reasonableness, Shane has not established a reasonable probability that the result of the proceeding would have been different had the jury been properly instructed regarding the use of prior inconsistent statements as substantive evidence. The post-conviction court properly rejected this claim for relief.

### B. Use Immunity

Shane argues that trial counsel was ineffective for failing to inform the jury that Hicks had been given use immunity for his trial testimony. At trial, Hicks's testimony was used to lay the foundation for the admission of photographs and a videotape of Hicks and Shane together at a party in August 1994, and at Hicks's wedding in February 1995, after Koontz's death. Although Shane acknowledges that Hicks did not say that Shane committed the crime, he asserts that the implication that Hicks was choosing to help the State would have affected the way the jury viewed the evidence. According to Shane, "[w]hile there probably was no benefit to Hicks by testifying, if he refused to after being granted immunity the Court could

---

[2] Shane's argument only refers to Daniel's prior inconsistent statement from her grand jury testimony. He makes no argument that either he or Hicks should be considered the declarant under the Modesitt analysis.

11

have found him in contempt and punished him with additional prison time." Appellant's Br. p. 15.

At the post-conviction relief hearing, trial counsel was questioned about whether a jury should be made aware that a witness has received use immunity. Trial counsel stated, "use immunity is really nothing. I don't think the witness gains or loses anything by use immunity. So I don't know. It would just depend on what the situation was." Tr. p. 8. "Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference." Timberlake v. State, 753 N.E.2d 591, 603 (Ind. 2001), cert. denied. "A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id.

In this context, where Hicks's testimony did not implicate Shane in the commission of the crime and was used only to lay the foundation for the admission of photographic evidence of the two men together socially after the murder, the failure to inform the jury of the grant of use immunity was a reasonable strategic decision by trial counsel. Cf. J.J. v. State, 858 N.E.2d 244, 251 (Ind. Ct. App. 2006) ("Although there may be strategic reasons to not reveal to the jury that D.S. had been given use immunity, trial counsel testified at the post-conviction hearing that he had no strategic reason for not informing the jury of the use immunity and recognized it would be a good defense strategy to inform the jury."). The post-conviction court properly rejected this basis for relief.

### C. Lisa Waddell's Testimony

Lisa Waddell testified that she was jogging in the mobile home park where Shane lived from 11:30 p.m. until midnight on the night Koontz was killed. She testified that between 11:45 p.m. and 11:55 p.m. she saw a silver or gray Suburban enter the mobile home park, that she "got brighted" by the Suburban as it approached, and that the Suburban was parked at Shane's mobile home on a daily basis. R. p. 558. Shane argues that this testimony corroborated his statement to the police that one of the headlights on the Suburban was out and that trial counsel failed to use this testimony to adequately rebut the State's argument that Shane drove the motorcycle to Koontz's trailer that night because it was less noticeable than the Suburban.

Shane recognizes that trial counsel did make an argument about the headlight being out. But, according to Shane, trial counsel should have more thoroughly argued that they took the motorcycle to Koontz's that night because driving the Suburban with either a headlight out or the brights on was an invitation to be pulled over or arrested or for the Suburban to be impounded. Shane, however, does not direct us to any testimony by Waddell that the Suburban's brights were on because a headlight was out, and our review of the record does not indicate any such testimony by Waddell. In fact, she testified that she thought they might have "brighted" her because they did not see her and thought she was an animal or a kid. Id. at 558. Based on the limited nature of Waddell's testimony, Shane has not established that trial counsel's performance fell below an objective standard of reasonableness as it related to using Waddell's testimony to corroborate Shane's statement to police. The post-conviction court properly denied this claim.

13

### D. Amy Case's Testimony

At trial, Amy Case testified about a conversation in which Hicks and Shane discussed committing the "perfect murder." Id. at 746. Shane argues that trial counsel was ineffective for failing to impeach Case with "available evidence," which suggested that it was Hicks who stated he knew how to commit the perfect murder. Appellant's Br. p. 18. In support of this argument, Shane relies on a portion of Hicks's trial transcript in which Case was questioned about this conversation. The prosecutor asked Case, "What, if anything, did you hear the Defendant say about that incident . . . ." Ex. Vol. III p. 717. Hicks's attorney objected, and the prosecutor made an offer of proof asserting that Case would testify that "he says 'he knows how to do a murder and get away with it.'" Id. at 718.

Shane directs us to no authority supporting the proposition that an attorney's summary offer of proof can be used as a prior inconsistent statement to impeach a witness's subsequent testimony. Without such authority, Shane has not established that trial counsel's failure to impeach Case based on her anticipated testimony from another proceeding fell below an objective level of reasonableness. The post-conviction properly concluded that trial counsel could not have impeached Case on this issue.

### E. Hicks's Statements to Police

At trial, Indiana State Police Detective Brian Buroker testified regarding his interview with Hicks the day after Koontz's death. Detective Buroker testified that Hicks told police that he was with Shane at the time of the murder. Shane argues that trial counsel should have objected to this testimony on Sixth Amendment grounds because "Hicks' statements included

14

reference to Shane and were used against him at trial . . . ." Appellant's Br. p. 18. Even if trial counsel should have objected and such an objection would have been sustained, Shane has not established that he was prejudiced by this evidence.

Shane asserts that this testimony indicated that Shane and Hicks had conspired to create an alibi and tied Shane in as a knowing and willing participant in the murder. However, there was extensive testimony regarding Shane's statements to police in which Shane consistently indicated he was with Hicks that night. Eventually, Shane even admitted he drove Hicks to and from Koontz's trailer that night. Moreover, Shane's own statements to police clearly demonstrated that the men agreed to be alibis for each other. Detective Buroker testified that, after Shane was indicted, Shane told Detective Buroker that he and Hicks discussed what their alibi would be and that they had a conversation about not telling police Hicks had left and gone to Koontz's trailer. See R. p. 648. Thus, the fact that Detective Buroker relayed statements in which Hicks used Shane as an alibi was merely cumulative of other evidence that they had agreed to be each other's alibis. Shane has not shown that he was prejudiced by trial counsel's failure to object to Hicks's statement to police on confrontation grounds. The post-conviction court properly rejected the argument.

### F. Cumulative Effect

Shane argues that, although the claimed errors may not have prejudiced him individually, the cumulative effect of the errors denied him a fair trial. In support of this argument, Shane focuses on some of the evidence considered by our supreme court on direct appeal to affirm Shane's murder, conspiracy, and feticide convictions and asserts that,

without this evidence, he would have been acquitted. This argument is unavailing because most of Shane's claims of deficient performance are not well taken and the two claims that we did resolve on the prejudice prong of the Strickland analysis—the jury instruction issue and the confrontation issue—are minor when taken in context. Grinstead v. State, 845 N.E.2d 1027, 1037 (Ind. 2006) ("Most of Grinstead's contentions of deficient performance are not well taken, and the modest nature of counsel's one or two failings make them insufficient to overcome the strong presumption that counsel performed adequately within the meaning of the Sixth Amendment.").[3] This claim is unavailing.

## II. Ineffective Assistance of Appellate Counsel

Shane argues that appellate counsel should have challenged the admission of evidence that Koontz was afraid of Shane and/or Hicks before she died. Appellant's Br. p. 22. The standard for gauging appellate counsel's performance is the same as that for trial counsel; therefore, to prevail on an ineffective assistance of counsel claim, Shane must show both deficient performance and resulting prejudice. See Pruitt v. State, 903 N.E.2d 899, 928 (Ind. 2009). "Ineffective assistance of appellate counsel claims fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well." Carter v. State, 929 N.E.2d 1276, 1278 (Ind. 2010). Shane's claim involves waiver for appellate counsel's failure to raise issues on direct appeal.

---

[3] Shane summarily asserts that trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, depriving him of his Sixth Amendment right to counsel. See United States v. Cronic, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984). We summarily reject this assertion. See Ind. Appellate Rule 46(A)(8)(a) (explaining that an argument must contain the contentions of the appellant supported by cogent reasoning).

Ineffectiveness is rarely found in such cases. Bieghler v. State, 690 N.E.2d 188, 193 (Ind. 1997), cert. denied. "[W]hen assessing these types of ineffectiveness claims, reviewing courts should be particularly deferential to counsel's strategic decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable." Id. at 194. In assessing counsel's performance, we look to see whether any unraised issues were significant and obvious upon the face of the record and, if so, whether any such issues were clearly stronger than the issue or issues appellate counsel decided to raise on direct appeal. Id. "For purposes of ineffective assistance of appellate counsel claims, we judge the reasonableness of appellate counsel's strategic decisions based upon precedent that was available at the time the brief was filed." Williamson v. State, 798 N.E.2d 450, 454 (Ind. Ct. App. 2003), trans. denied. If this analysis establishes deficient performance on counsel's part, we then analyze whether the issue or issues that counsel failed to raise clearly would have been more likely to result in reversal or a new trial than the issue or issues that counsel actually raised. Id. The ultimate issue under the prejudice prong is whether, but for counsel's error or errors, there is a reasonable probability that the outcome of the defendant's direct appeal would have been different. Id.

Shane directs us to the testimony of Eva Koontz, Koontz's mother, who testified that Koontz thought Hicks and Shane "were trying to get her"[4] and asserts that the trial court erred

---

[4] Two of the three citations to the Record cited by Shane are arguments by counsel. The only testimony to which Shane specifically cites is Eva's testimony. We, therefore, limit our analysis to this testimony. It is worth noting, however, that the other evidence of Koontz's fear of Hicks actually supported Shane's theory that Hicks, not Shane, killed Koontz.

in admitting evidence of Koontz's state of mind, over his objection.[5] R. p. 357. In support of this argument, Shane cites Camm v. State, 812 N.E.2d 1127, 1139 (Ind. Ct. App. 2004), trans. denied. In Camm, we observed, "[e]vidence of a victim's state of mind is relevant and admissible '(1) to show the intent of the victim to act in a particular way, (2) when the defendant puts the victim's state of mind in issue, and (3) sometimes to explain physical injuries suffered by the victim.'" Camm, 812 N.E.2d at 1139 (quoting Hatcher v. State, 735 N.E.2d 1155, 1161 (Ind. 2000) (emphasis added in Camm)). Shane then points out that, in Hatcher, our supreme court observed, "[a]lthough the nature of the relationship may be relevant to show motive, we recently observed that motive does not constitute an exception to the hearsay rule." Hatcher, 735 N.E.2d at 1161(citing Willey v. State, 712 N.E.2d 434, 443 (Ind. 1999)).

Shane does not provide any specific analysis of these factors, nor does he cite authority that existed at the time his appellate brief was filed in February 1998. As such, Shane has not shown that this unraised issue was significant and obvious upon the face of the record based upon precedent that was available at the time the brief was filed. See Bieghler, 690 N.E.2d at 194; Williamson, 798 N.E.2d at 454. Thus, Shane has not established that appellate counsel's performance was deficient.

---

[5] It is not entirely clear that Shane objected to Eva's testimony on this basis. We will assume, however, that the issue was properly preserved.

Even if he had made such a showing, he provides no argument regarding whether this issue would have been more likely to result in reversal or a new trial than the issue or issues that counsel actually raised. Instead, Shane summarily argues, "[c]ounsel was ineffective for failing to include this issue in the direct appeal because the convictions would have been overturned if it had been; a new trial is therefore the appropriate remedy herein." Appellant's Br. p. 23. In the absence of such argument, Shane has not established that post-conviction court improperly rejected this claim.

## Conclusion

Shane has not established that the post-conviction court improperly denied his petition. We affirm.

Affirmed.

VAIDIK, J., and MATHIAS, J., concur.